**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08 C 2957** |
| | ) | |
| **VERNADO PARKER** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Vernado Parker pled guilty to a charge of conspiracy to possess in excess of five

kilograms of cocaine with intent to distribute, and the Court sentenced him to a 121

month prison term. Parker has filed a motion to vacate the conviction and sentence

pursuant to 28 U.S.C. § 2255. After determining that an evidentiary hearing was

required on at least one of the claims Parker asserted, the Court appointed counsel to

represent him. The Court ultimately conducted an evidentiary hearing on two of

Parker's claims. This constitutes the Court's findings of fact and conclusions of law.

**Background**

**1.      The charges and the disposition**

Parker was charged, along with a number of other defendants, in a thirty-three

count superseding indictment. The charges against Parker included conspiracy to

possess in excess of five kilograms of cocaine with intent to distribute (Count 1),

possession of an unspecified amount of cocaine with intent to distribute (Count 15), and

eleven charges of use of a communication facility to facilitate the charged conspiracy

(Counts 4, 12, 16, 18, and 21-29).

After several days of trial, Parker entered a guilty plea to the conspiracy charge pursuant to an oral plea agreement. As part of the plea agreement, he admitted that he was responsible for 50 to 150 kilograms of cocaine in connection with the offense. The Court later sentenced Parker to 121 months imprisonment.

**2.    Parker's section 2255 motion**

Parker filed a *pro se* section 2255 motion. His claims, which the Court pieced together by reading in tandem the motion, supporting affidavit, and supporting memorandum, were as follows:

1)    Trial counsel gave him inaccurate advice regarding the implications of his agreement to a drug quantity of 50 to 150 kilograms of cocaine. Counsel advised him that the "worst case" scenario was a seven year sentence. He told counsel that he was not responsible for 50 to 150 kilograms and did not want to admit to that and that he wanted to admit only to 15 kilograms. Counsel advised him that the quantity did not matter because he would get the same sentence no matter what quantity was involved. Counsel's advice, Parker contends, amounted to ineffective assistance.

2)    Trial counsel rendered ineffective assistance by failing to object to the drug quantities upon which the Court relied at sentencing. Parker contends that he was not, in fact, responsible for the entire quantity used as the basis for his sentence and that certain amounts were improperly imputed to him.

3)    The Court sentenced him based on an inaccurate drug quantity determination.

4)    The Court should not have imposed the mandatory minimum term of supervised release, because the application of the safety valve made the mandatory

minimum inapplicable.

5)     He asked his attorneys to file an appeal, but they failed to do so and thus rendered ineffective assistance.

The Court initially ordered a hearing on claim five, Parker's claim that his attorneys rendered ineffective assistance by failing to file a notice of appeal. After the Court appointed counsel, Parker filed an amended petition in which he elaborated on that claim as well as claim one, his claim of ineffective assistance concerning the advice he was given about the implications of the plea agreement. The Court then expanded the hearing so that it also covered that claim.

### Facts

At the evidentiary hearing, both Parker and his trial attorneys testified. There were three other witnesses: a man who accompanied Parker to a meeting at his lawyer's office concerning the proposed plea deal and later attended the sentencing hearing, and two men who attended the sentencing hearing. The Court finds the facts as follows, having made judgments regarding the credibility of the witnesses and the weight to be given their testimony.

### 1.    The plea negotiations

After several days of trial, on Friday, February 9, 2007,[1] the prosecutors contacted one of Parker's attorneys and conveyed an offer for a plea bargain. The prosecutor stated that if Parker pled guilty to the conspiracy charge and stipulated to a drug quantity of 50 to 150 kilograms of cocaine, the government would agree to dismiss

---

[1] The trial had recessed at the end of the day on Thursday, February 8 and was set to reconvene on Monday, February 12.

the remaining charges and would recommend a two-level reduction for acceptance of responsibility and application of the "safety valve" under the Sentencing Guidelines. The prosecutor advised that Parker would have to provide a written safety valve "proffer" as a condition of the government's acceptance of the deal.

The attorney contacted Parker, who went to the attorney's office along with several friends with whom he consulted at various times during his meeting with the attorney. Parker's other attorney was not present for the meeting. Defense counsel set out for Parker the terms of the prosecutor's proposal as described above. Counsel told Parker that he had to accept the offer that day, or the trial would continue the following Monday.

Defense counsel told Parker that the charge to which he would be pleading guilty carried a ten year mandatory minimum prison term. She told him, however, that if he qualified for the safety valve, the mandatory minimum would not apply. Both of these statements were accurate.

One of the disputed issues concerns what defense counsel told Parker about the likely sentence. Parker testified that counsel told him that if he qualified for the safety valve, he likely would get a seven year sentence if the Court "was in a bad mood" and that the actual time he served on a seven year sentence would be less than that. Parker's friend Derrel McDavid, who was present during parts of Parker's meeting with defense counsel, testified that counsel told Parker that with the safety valve, he would get a seven year sentence if the Court was in a good mood and could get further time off for good behavior and participation in a drug program.

Defense counsel testified that she told Parker the ultimate sentence would be up

4

to the Court. She stated that she did not definitively tell Parker what the sentence would be, as she had no way of knowing what sentence the Court would impose. She denied telling Parker that the best case scenario was a seven year sentence.

Counsel did, however, recall telling Parker that the worst case scenario would be a ten year sentence. In other words, based on counsel's own testimony, she claims to have advised Parker that the worst sentence he could get was a sentence of 120 months, that is, one month below the low end of the Guidelines range.

Counsel also testified that she went over with Parker the actual amount of time he would serve on a 120 month sentence. She testified that she advised Parker that with time off for good behavior, the possibility of a further reduction if he was able to get into a drug treatment program in prison, and "halfway house" time of six months at the end of his sentence, he would serve approximately seven years of actual prison time on a 120 month sentence.

The Court finds that counsel advised Parker that if he accepted the government's terms, the worst he would get was a mandatory-minimum sentence of 120 months. The Court further finds that counsel told Parker, accurately, that application of the safety valve would enable the Court to impose a sentence below the mandatory minimum. Counsel made no promise, however, that Parker would get a sentence lower than the mandatory minimum. That said, the Court is persuaded that counsel predicted the Court was likely to impose a sentence lower than 120 months, based on the application of the safety valve and other mitigating factors. That is consistent with counsel's admission that she told Parker that 120 months was the worst-case scenario, and it is supported by the testimony of Parker and McDavid that

5

counsel predicted a lower sentence.

The Court also finds that during the meeting, Parker balked at admitting to a quantity of 50 to 150 kilograms of cocaine. He believed that he was responsible for, at the most, 15 kilograms. Counsel did not recall Parker expressing any disagreement with the 50 to 150 kilogram quantity. But confirmation of Parker's reluctance to admit to responsibility for 50 to 150 kilograms is found in the safety valve proffer that defense counsel submitted to the prosecutor in late April 2007. Counsel prepared the initial proffer together with Parker. It included a discussion of his claimed involvement in narcotics dealing but said nothing about quantities. Defense counsel told Parker she thought the prosecutor would reject the proffer for that reason, and the prosecutor in fact did so. Defense counsel then prepared a revised proffer together with Parker and submitted it to the prosecutor in mid-May 2007, shortly before the sentencing hearing. This version of the proffer discussed some amounts but said that two of the government's cooperating witness had grossly exaggerated the amounts they attributed to Parker. The proffer also contained this language:

> However, consistent with my guilty plea, and consistent with the Supreme
> Court's mandates in *North Carolina v. Alford*, 400 U.S. 25 (1970), (as that
> case was explained to me by my attorneys) and based on the evidence
> that I have reviewed involving my case, I concede that I distributed at least
> 50 kilograms of cocaine but less than 150 kilograms. It is my belief that
> the actual amount was closer to the minimum of 50 kilograms.

Hrg. Ex. 3.

In short, even in the final version of the proffer, Parker did not squarely admit a 50-150 kilogram quantity but rather "concede[d]," in the manner of an *Alford* plea, that the government had evidence to support that quantity. All of this, in the Court's view,

6

supports a finding that at the February 9 meeting, Parker expressed reluctance to agree to a quantity of 50-150 kilograms. The Court so finds.

Counsel told Parker that if he did not admit to responsibility for 50 to 150 kilograms, the government would not agree to the deal, including the safety valve. Parker testified that he understood the government's agreement to the safety valve was required before the safety valve could be applied. Defense counsel denied telling Parker this. She testified credibly that although she believed the government's agreement to the safety valve would be beneficial, she understood the government's agreement was not legally required in order for the safety valve to apply. Counsel conceded during her testimony, however, that she did not advise Parker that the government's agreement on the safety valve was not legally required. The Court finds that counsel's comments and omissions led Parker to believe that the government's agreement was a condition for application of the safety valve and that she told him he had to agree to a quantity of 50 to 150 kilograms if he wanted the government to agree to the safety valve.

Parker testified that defense counsel advised him that an admission to 50 or more kilograms would not affect his sentence and that he would get the same sentence based on that quantity as he would get if he admitted to only 15 kilograms. The Court finds Parker's testimony in this regard credible. Counsel did not seem to appreciate fully that the quantity of drugs involved might affect the Court's consideration of the sentencing factors under 18 U.S.C. § 3553(a), completely aside from how it would impact the Sentencing Guidelines calculation.

Parker testified that had he known he could have gotten the safety valve without

agreeing to a quantity of 50 to 150 kilograms, he would have jumped at the chance. The Court finds that testimony credible. Based, however, on his misunderstanding regarding the need for the government's agreement on the safety valve and the conditions for such an agreement, Parker agreed, albeit reluctantly, to the stipulated drug quantity.

The plea deal gave Parker three benefits: the government's agreement that he was entitled to a two-level reduction for acceptance of responsibility (the "third point" was never a possibility given the timing of the guilty plea); its agreement on the safety valve; and its agreement to dismiss the remaining counts of the indictment. The agreement to dismiss the remaining charges was only superficially beneficial to Parker. None of the other charges implicated the possibility of a consecutive sentence, as all arose from the same alleged course of conduct. Sentencing Guidelines calculations in narcotics cases are premised largely on the overall quantity of narcotics for which the defendant is responsible, a fact established in this case via the stipulation, not the number of counts. And even aside from the Guidelines calculation, it mattered not whether Parker pled guilty to one, two, or ten charges arising from the same scheme or course of conduct.

The government's agreement on the other two points (acceptance of responsibility and the safety valve) was beneficial to Parker because it decreased the likelihood that the Court would reject those reductions. The government's agreement was not, however, legally required for Parker to get the benefit of the favorable Guidelines reductions involved. The Court finds that Parker was unaware of this, because trial counsel did not tell him that the government's agreement was not required

and in fact led him to believe the opposite.[2]

To summarize:

- Defense counsel accurately communicated to Parker the terms of the government's plea offer.

- Counsel told Parker that if he agreed to the government's proposal, a 120 month sentence was the worst case scenario. She predicted, but did not promise, that the Court would impose a lower sentence.

- Parker did not want to admit to a 50-150 kilogram quantity. Counsel told him, accurately, this was a condition of the government's proposed deal. She made it clear to Parker that an admission to 50-150 kilograms was critical to get the government's agreement to the safety valve and acceptance of responsibility, and she led Parker to believe that the government's agreement was necessary to obtain those reductions. Counsel also told Parker that an admission to a 50-150 kilogram quantity would not affect his sentence.

## 2.    The guilty plea

On the afternoon of February 9, Parker pled guilty to the narcotics conspiracy charge, pursuant to what was described in court as an oral plea agreement. The conspiracy charge carried a mandatory minimum prison term of ten years.

The oral plea agreement was described in open court at the time of Parker's

_____

[2]  Though not critical to the current analysis, it is undisputed that  defense counsel did not discuss with Parker the possibility of a "blind" plea or the pros and cons of pleading guilty without a plea agreement as compared with pleading guilty on the conditions offered by the government.  Had Parker pled guilty blind, he would have had to admit only to a quantity of at least five kilograms of cocaine, not fifty kilograms.

guilty plea.  Parker agreed to plead guilty to the conspiracy charge and accept a

preliminary order of forfeiture; the government agreed to dismiss the remaining charges

against him; the parties agreed to a Sentencing Guidelines base offense level of 36; the

government conditionally agreed to recommend a two-level reduction for acceptance of

responsibility; and the government agreed to "recommend the safety valve if the

defendant complies with the statute."  Feb. 9, 2007 Tr. 2-3.  Parker's attorneys

confirmed this was consistent with their understanding.  *Id.* 3.

> The Court elicited Parker's understanding of the terms of the oral agreement:
>
> THE COURT:  . . .  As I understand it, there is essentially a verbal
> agreement, if you will, that you are going to be pleading guilty to one of
> the charges; namely, the charge of conspiracy to possess certain
> narcotics with the intent to distribute, that the government is going to
> dismiss or drop the other charges against you, and you are going to – that
> there's certain agreements about sentencing factors, and I will go over
> those a little later.
>
> There is an agreement for something called a preliminary order of
> forfeiture, which I will go over with you later; and then there is an
> agreement, at lest for the possibility, that if certain things happen, the
> government will make some recommendations about whether you qualify
> for something called the safety valve under sentencing [sic].
>
> Did I basically capture everything?
>
> PROSECUTOR 1:  Yes, your Honor.
>
> THE COURT:  Is what I just said, Mr. Parker, consistent with what you
> understand about what the agreement is?
>
> THE DEFENDANT:  Yes.

*Id.* 8-9.

Parker then expressly affirmed that no one had promised him anything other

than this to get him to plead guilty.  *Id.* 9.  He also expressly denied that he had any

other agreements with the government other than what the Court and the prosecutor had described.  *Id.*

The Court advised Parker that the maximum possible sentence for the charge to which he was pleading guilty was life in prison.  *Id.* 10.  Parker stated that he understood.  *Id.* 11.

After describing what the government would have to prove to convict him, *id.* 11-12, the Court explained to Parker how it would go about determining the sentence to impose.  *Id.* 12.  The Court stated that it would have to consider the Sentencing Guidelines and explained to Parker how the Guidelines work.  *Id.* 12-13.  During this discussion, the Court advised Parker that under the Guidelines, "[i]n narcotics cases, the primary factor, though not the only factor, is the quantity of narcotics that was involved in the crime."  *Id.* 12.

The Court then again advised Parker that "there is a maximum sentence of life on these charges."  *Id.* 13.  The Court also advised him that the crime to which he was pleading guilty carried a ten year mandatory minimum prison term.  *Id.*  The Court told Parker that this meant that "I can't give you a sentence of less than 10 years in prison unless one of two things happens."  *Id.*  The first of the two exceptions to the mandatory minimum sentence, the Court explained, involved "assist[ing] the government in prosecuting someone else and the government comes in and asks me to give you a lower sentence . . . ."  *Id.*  The second exception, the Court advised, was "this thing called the safety valve that I referred to before."  *Id.*  The Court explained the safety valve as follows:

> THE COURT:  What the safety valve says is basically that if you do not have a prior criminal record and you give the government a complete statement of your involvement in the crime and you meet certain other requirements, if you meet all those requirements, then you qualify for the safety valve.
>
> If you qualify for the safety valve, then the mandatory minimum sentence doesn't apply.

*Id.* 13-14.  Parker stated that he understood all of this.  *Id.* 14.

The Court went on to reinforce that "[i]f neither of those two exceptions ends up applying in your case, the lowest sentence I can give you is 10 years in prison . . . ."  *Id.* Parker said he understood this.  *Id.*

The Court then explained how it would make the Sentencing Guidelines calculations (which the Court referred to as "scores").  The Court noted that Parker had "made some agreements with the government about how certain aspects of the scores should be calculated" and then returned to Parker's agreement with the government about the Guidelines calculation.  *Id.* 14-15.  The Court summarized that agreement as follows:

> THE COURT:  As I understand it, and I am going to leave it to the lawyers to correct me if I am wrong, you're agreeing that what is called the base offense level, which is an aspect of the score that concerns the crime, is going to be 36; that the government is going to recommend that you receive two points off of that for what is called acceptance of responsibility, so that would make it a 34; and that if you end up meeting the requirements for the safety valve, as I described it to you, then the government will agree to recommend that you get additional credit and points off for the safety valve.

*Id.* 15.  The Court asked Parker whether he understood that was his agreement with the government, and Parker said, "Yes."  *Id.*

The Court then made it clear to Parker that his agreements with the government

about the Sentencing Guidelines calculations were not binding on the Court, and that

the Court did not have to adopt them:

> THE COURT:  I want to make sure you understand that I have to make up
> my own mind about all of those things.  I am certainly going to listen to
> what your lawyer and the government lawyers tell me, and in the final
> analysis, I have to make up my own mind independently.  I am not saying
> this will happen, but it is at least possible that I could come out with a
> different calculation after I considered everything, including what the
> probation office tells me after they do their investigation.
>
> Do you understand that I an not bound by the agreement you have made
> with the government about how the score should be calculated?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  If I come out with a different calculation, you will not be
> able to change your mind about pleading guilty just because I came out
> with a different calculation.
>
> Do you understand that?
>
> THE DEFENDANT:  Yes, sir.

*Id.* 15-16.

> Near the end of the plea colloquy, the following exchange occurred:
>
> THE COURT:  . . .  The agreement on the base offense level, I take it,
> includes some sort of an understanding as to what the quantity of
> narcotics was that is involved?
>
> PROSECUTOR 1:  Correct, your Honor.
>
> THE COURT:  What is that?
>
> PROSECUTOR 1:  Up to 150 kilograms of cocaine.  It's the base offense
> level is [sic] 36.
>
> THE COURT:  More than what, less than what?
>
> PROSECUTOR 2:  It's greater than 50 kilograms but less than 150
> kilograms.

THE COURT:  Of cocaine [?]

PROSECUTOR 2:  Yes, of cocaine, and anywhere between that range.

*Id.* 20-21.  The Court did not elicit an agreement or admission from Parker at that point

during the colloquy.  But the Court returned to the point shortly after that, and Parker

admitted to the 50-150 kilogram quantity:

> THE COURT:  So how then do you plead to the charge in Count 1 of
> conspiracy to knowingly and intentionally possess with intent to distribute
> and to distribute controlled substances of greater than 50 but less than
> 150 kilograms of cocaine?  Do you plead guilty or not guilty to that
> charge?
>
> THE DEFENDANT:  Guilty.
>
> THE COURT:  And you're doing that voluntarily, is that right?
>
> THE DEFENDANT:  Yes.

*Id.* 22-23.

## 3.    The sentencing

The sentencing hearing took place on May 24, 2007.  At the outset of the

hearing, the prosecutor advised that the government was, in fact, recommending a two-

level reduction of the offense level for acceptance of responsibility, as well as the

application of the safety valve.  May 24, 2007 Tr. 3.  This meant that the total offense

level was 32, making the advisory range under the Sentencing Guidelines 121 to 151

months imprisonment.  *Id.* 4.  In addition, the application of the safety valve allowed the

Court to sentence Parker without regard to the statutory mandatory minimum sentence.

The defense presented a number of character witnesses.  *See id.* 7-21.  The

prosecutors made comments regarding the appropriate sentence and asked the Court

to sentence the defendant within the Guidelines range.  *Id.* 5-7, 21-22.  The Court asked the lead prosecutor several questions regarding his views about Parker's relative culpability and involvement in the conspiracy as compared with his co-defendants.  *Id.* 22-26.

The Court then had an extended discussion with both sides' counsel about the quantity of cocaine for which Parker was responsible.  The Court referenced the stipulation of a range of 50 to 150 kilograms, calling that "a pretty broad range," and asked whether "anybody is able to tell me anything that tells me where within that very large range it falls[,] without running afoul of any understandings or agreements that you have?"  *Id.* 26.  The prosecutor identified a particular witness who "put [defendant] in the range of around 80 kilos," and said that "our inference . . . [is] you are starting at 80 and moving upwards."  *Id.*  Defense counsel indicated that the witness the prosecutor had referenced was not particularly credible and that he had exaggerated the quantity involved.  Counsel further stated that "[w]e can't give you an exact or specific, but we would certainly argue, and knowing everything we do, it would be at the lower end of that range, your Honor. . . .  I think it's 50 to 60."  *Id.* 27.  The prosecutor replied that there was another witness who "put a 20 kilogram number on [defendant] in addition," and that as a result, the government "put[ ] [Parker] into the middle of that range," in other words, in the middle of the 50-150 kilogram range.  *Id.* 27-28.

After defense counsel made a presentation in mitigation, *id.* 28-30, Parker spoke on his own behalf.  *Id.* 30-31.  Among other things, he stated that "[w]hat was said about me, some of it is true.  A lot of it is overexaggerated, but that's how it is."  *Id.* 31.

The Court discussed the factors that it considered significant in imposing sentence. *Id.* 31-36.  One significant factor, as the Court expressed it at the sentencing hearing, was that the offense involved "what anybody would fairly say was an enormous quantity of cocaine." *Id.* 33.  The Court noted that "I don't know the precise number, but I know that it's at least 50 kilograms.  That is 110 pounds of cocaine because that is what was agreed to, and it's potentially more than that; and 110 pounds of cocaine is one heck of a lot of cocaine." *Id.*

The Court imposed a sentence of 121 months, the low end of the advisory Guidelines range, and one month higher than the mandatory minimum sentence of 120 months.  The Court stated that "a sentence within the guideline range but at the very low end of it is reasonable, and it is not greater than necessary, and it is not excessive, and it is necessary to fulfill the purposes of sentencing." *Id.* 35-36.  At the conclusion of the hearing, the Court advised Parker of his right to appeal, stating, among other things, that "[i]f you want to file a notice of appeal, you should advise your lawyers, and they are obligated to take care of you [sic]." *Id.* 40.

## 4.    Post-sentencing events

The witnesses who testified at the evidentiary hearing also offered testimony regarding communications between Parker and his attorneys after the sentencing.  The defense lawyer who had the meeting with Parker about the government's plea proposal testified that she did not speak with Parker at all after the sentencing, and she denied having any discussion with him about an appeal.  She testified that she was not surprised by the 121 month sentence the Court imposed and that she was unaware of

Parker being surprised by the sentence.  The other defense lawyer testified that he likely spoke with Parker outside the courtroom after the sentencing but did not recall anything about the conversation.  He stated that Parker never asked him to file an appeal and never expressed any interest in appealing.  He also testified that he was unaware of any appealable issue in the case.

Parker testified that he was surprised by the sentence and that in the hallway outside the courtroom, he asked the lawyers whether "we" were going to appeal.  He testified that one of the lawyers – he could not recall which one – replied that they would take care of it and would discuss it later.  There was no follow-up meeting, however.  Parker did not testify that he told the attorneys to file an appeal on his behalf.

The Court finds that Parker inquired about the possibility of an appeal but did not ask, tell, or direct his lawyers to file an appeal.  Similarly, the attorneys did not tell Parker that they would file an appeal.  Rather, Parker left this for further discussion with them, and then he did not follow up.  As Parker explained it at the hearing, he was occupied with other things, including explaining to his friends and family what had happened and the fact that he was going to prison.  Counsel likewise did not follow up with Parker about the possibility of an appeal despite his inquiries about the possibility of an appeal.

## Discussion

### 1.    Advice regarding guilty plea and related issues

A defendant claiming ineffective assistance of counsel in a criminal case must show that counsel's representation was deficient in that it fell below an objective

standard of reasonableness and that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). This standard applies to claims of ineffective assistance based on counsel's advice and performance during the process of plea negotiation. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

"[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992). Before advising a client regarding a proposed plea agreement, a reasonably competent lawyer will attempt to learn all the relevant facts of the case, estimate the likely sentence, and communicate the results of the analysis to the client. *See, e.g., Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006). "[S]ome predictions [regarding the likely sentence] are such gross mischaracterizations that they provide 'a strong indication of [constitutionally] deficient performance.'" *United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir. 1999). But although a mischaracterization of the sentencing consequences of a proposed guilty plea "may strongly indicate deficient performance, it is not proof of deficiency." *Id.*; *see also United States v. Cieslowski*, 410 F.3d 353, 359 (7th Cir. 2005).

Trial counsel admitted during her testimony at the hearing that she advised Parker that the worst case scenario was a 120 month sentence. That advice was incorrect, and the Court is constrained to say that no reasonable lawyer would have given such advice. Even if everything went right and Parker ended up getting the safety valve and acceptance of responsibility reductions, that would have left him (as ended up being the case) with an advisory Guidelines range with a *low end* of 121 months. A

sentence below the low end of the Guidelines range – even just one month below – can *never* be the worst case scenario, absent perhaps an agreement by the government to a below-Guidelines sentence.  Because Parker's advisory Guidelines range under the all-goes-as-planned scenario was 121 to 151 months, the actual worst case scenario in that situation was no better than 151 months, the high end of the range.  And because the safety valve and acceptance of responsibility reductions were not guaranteed, the true worst case scenario was actually even worse than that.  Under no stretch of a reasonably competent lawyer's imagination was a 120 month sentence the worst case scenario.

Though counsel accurately advised Parker that an admission to a quantity of 50 to 150 kilograms of cocaine was a condition of the deal the government had proposed, she gave him erroneous advice about the effect of that admission.  The Court previously found credible Parker's testimony that counsel advised him that the admission would not affect his sentence.  This was incorrect, first of all, because the admission clearly affected the Sentencing Guidelines range.  The Court does not believe, however, that this is what counsel meant when she made this statement or that this is how Parker understood it.  Rather, the thrust of counsel's statement was that the quantity of drugs involved would not *otherwise* impact the ultimate sentence.  This, too, was incorrect.  The Sentencing Guidelines range, of course, is only advisory, and a court is required to consider other factors in determining the sentence.  One of those factors is "the nature and circumstances of the offense."  18 U.S.C. § 3553(a).  The quantity of narcotics involved in a drug-dealing crime like the one to which Parker pled guilty is quite plainly an important "circumstance[ ] of the offense" – among other things,

19

it gives an indication of just how much drug dealing the defendant is involved in and how significant a drug dealer he is. No reasonable lawyer would advise a defendant, at least not in the post-*Booker* environment, that the quantity of drugs involved in an offense would not impact the sentence to be imposed.

Though Parker has established that he received erroneous advice by counsel that fell below an objective standard of reasonableness, that by itself does not entitle him to relief under section 2255. Parker must also show that he was prejudiced by counsel's advice.

Parker has failed to make the necessary showing of prejudice. His *pro se* petition, his testimony, and his presentation at and after the hearing was focused on the fact that he could have and would have made a better plea deal had he gotten good advice, or perhaps that he would have pled guilty "blind" without making the same damaging admission regarding quantity. Though that may well be true, it does not establish the necessary prejudice. "Whether [the defendant] could have negotiated a better plea deal is irrelevant to the issue of prejudice in the ineffective assistance context." *Bethel*, 458 F.3d at 720. To put it another way, "a claim that a defendant would not have entered this particular plea agreement is not sufficient to show prejudice." *Id.* (citing *Hill*, 474 U.S. at 59). Rather, the defendant must show that "absent counsel's erroneous advice, he would not have pled guilty but would have insisted on going to trial," *id.* at 718, or in Parker's case, that he would have insisted on seeing the trial through to the end.

Parker has failed to make that showing. First of all, he did not allege in his section 2255 motion, nor did he testify at the hearing, that he would not have pled guilty

absent counsel's erroneous advice about the worst case scenario or the effect of his admission regarding the quantity of cocaine. A straight-faced argument can be made that the fact that Parker *had* proceeded to trial, which was ongoing, is sufficient to establish circumstantially that he would have seen the trial through to its end absent counsel's erroneous advice about the effect of the plea deal. But any such claim is undercut by the Court's advice and Parker's admissions during the guilty plea colloquy. The plea colloquy establishes that Parker understood, or at least testified under oath that he understood, the following points:

-    The charge carried a mandatory minimum sentence of ten years (120 months) and a maximum possible sentence of life imprisonment.

-    There are only two exceptions to the mandatory minimum.

-    The only exception with possible application in his case was the safety valve.

-    Even though the government had agreed to recommend the safety valve, the Court was not bound by the agreement and could find that the safety valve did not apply. There was no guarantee that Parker would get the safety valve.

-    Parker would not be able to withdraw his guilty plea if the Court did not go along with the parties' agreements regarding the safety valve and other Sentencing Guidelines factors.

-    If the safety valve did not apply, the *best* sentence Parker could get was 120 months.

-    Parker also understood that the Sentencing Guidelines calculation was advisory only and that the Court had to consider other factors.

-       Finally, Parker unequivocally agreed during the plea colloquy that he was criminally responsible for a quantity of 50 to 150 kilograms of cocaine.

Any contention that Parker would not have pled guilty had he known that 120 months was not the worst case scenario but rather was arguably the best case scenario would run head-on into Parker's admissions under oath during the plea colloquy. "'[T]he record of a Rule 11 [guilty plea] proceeding is entitled to a "presumption of verity" . . . and the answers contained therein are binding.'" *United States v. Martinez*, 169 F.3d 1049, 1054 (7th Cir. 1999). Indeed, Parker stated under oath during the guilty plea hearing that no one had promised him anything to get him to plead guilty, a statement that runs directly contrary to any contention at this point that absent his lawyer's assurance that the worst he would get was a 120 month sentence, he would not have pled guilty. "'Judges need not let litigants contradict themselves so readily . . . .'" *Bethel*, 458 F.3d at 719 (quoting *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005)). Parker's responses to the Court's inquiries at the guilty plea hearing make it clear that he was willing to plead guilty even though he understood that he could end up with a 120 month sentence (or worse) – and his actual sentence was only one month greater than that.

The Court reaches the same conclusion about the effect of counsel's erroneous advice about the effect of his admission regarding the quantity of cocaine. Parker says, and the Court has found, that counsel erroneously advised him that the admission would not affect his sentence for the worse. But Parker's admissions under oath at the guilty plea hearing undermine any contention he might make at this point that absent this advice, he would not have entered a guilty plea. This advice by counsel was no

less a promise than the statement that the worst case scenario was a 120 month sentence. Yet Parker stated under oath at the plea hearing that no one had "promised [him] anything at all *to get* [*him*] *to plead guilty*." Feb. 9, 2007 Tr. 9 (emphasis added). This amounts to an admission that no promises anyone had made to Parker (other than his agreement with the government) affected his decision to enter a guilty plea.

For these reasons, the Court finds that Parker has failed to show that he was prejudiced in the way required by *Hill v. Lockhart* by his counsel's erroneous advice about the consequences of the plea agreement.

**2.     Non-filing of a notice of appeal**

Parker makes two arguments regarding the non-filing of a notice of appeal. His first argument is that his lawyers ignored his instructions to file an appeal on his behalf. "[A] lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). The Court has found, however, that Parker did not direct his attorneys to file an appeal.

Parker's second argument is that his lawyers failed to consult with him about filing an appeal. There was no evidence that Parker told his attorneys he did not want to file an appeal, so this case falls in the middle ground explored by the Supreme Court in *Flores-Ortega*, namely, "[i]s counsel deficient for not filing a notice of appeal when the defendant has not clearly conveyed his wishes one way or the other?" *Id.* In this regard, the Court in *Flores-Ortega* established a two-step inquiry. The first question is whether counsel consulted with the defendant about the possibility of filing an appeal.

If so, "[c]ounsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Id.* at 478. But even absent actual consultation, "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.*

Parker has established by a preponderance of the evidence that the latter of these two bases applies. The Court has found that the outside the courtroom after sentencing, he expressed to counsel an interest in appealing. Parker's testimony in this regard was credible – at least in part, because it is clear that Court imposed a sentence that was greater than Parker had hoped for. Because Parker's comments would have indicated to a reasonable lawyer an interest in appealing, trial counsel were obligated to consult with him about whether to file a notice of appeal.[3] They did not do so.

The Court notes that it would reach the same result even had it accepted the testimony of trial counsel on the question whether they discussed a possible appeal with Parker. At the hearing, one of Parker's trial attorneys flatly denied talking to him *at all* about an appeal, and the other had a complete failure of recollection other than to say that Parker expressed no interest in appealing. Under *Flores-Ortega*, counsel is obligated to discuss the possibility of appeal with his client if "there is reason to think . . .

---

[3] This would not, of course, have obligated counsel to actually represent Parker on appeal – unless, of course, they had worked out a mutually acceptable fee agreement.

that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal)." *Flores-Ortega*, 528 U.S. at 478. Contrary to the testimony of the latter attorney, there were, in fact, nonfrivolous (though not necessarily meritorious) grounds for an appeal, arising from the Court's failure to impose a sentence below the advisory Guidelines range. Sentences are reviewed on appeal for reasonableness in light of the statutory factors provided by 18 U.S.C. § 3553(a). *See, e.g., Gall v. United States*, 552 U.S. 38, 46 (2007). A sentence within a properly-calculated Guidelines range is presumed on appeal to be reasonable, *see, e.g., United States v. Welton*, 583 F.3d 494, 496 (7th Cir. 2008), but the presumption is rebuttable. *Rita v. United States*, 551 U.S. 338, 347 (2007). A sentencing judge must, among other things, "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Id.* at 356. The Court believes that it considered the relevant factors under section 3553(a) as well as Parker's arguments. The question, however, is not whether the Court believes it erred, but whether an appeal would have been frivolous. Given the prevalence of sentencing appeals in the post-*Booker* environment, and the fact that the Court rejected Parker's argument for a below-Guidelines sentence, the Court cannot say that an appeal would have been frivolous. Thus even were the Court to have accepted the testimony of Parker's trial attorneys about what happened after the sentencing, the Court still would conclude that counsel rendered constitutionally ineffective assistance by failing to consult with Parker about the possibility of an appeal.

"[W]hen counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." *Flores-Ortega*, 528 U.S. at 484. Parker has offered evidence sufficient to meet his burden of showing prejudice under *Flores-Ortega*.

## Conclusion

For the reasons stated above, the Court grants defendant's section 2255 motion in part. Specifically, the Court grants the motion with regard to defendant's claim that his attorneys failed to consult with him about filing an appeal. The Court denies the motion with prejudice with regard to defendant's claims that his attorneys provided ineffective assistance in advising him regarding his guilty plea and that the attorneys failed to file an express instruction to appeal. The Court also denies the motion as to Parker's remaining claims, without prejudice to Parker's assertion of those claims on the appeal he will now be able to take. The Court believes that the appropriate relief is to vacate and reenter the judgment so that Parker can file a timely appeal. The case is set for a status hearing on December 2, 2009 at 9:30 a.m. so that counsel can express their views on the nature of the judgment the Court should enter consistent with the rulings that it has made.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 23, 2009